IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DANNY GOMEZ,<br><br>            Plaintiff,<br><br>     vs.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>            Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No: 1:06-CV-25 DN<br><br>Magistrate Judge David Nuffer |

Plaintiff Danny Gomez seeks judicial review of the Commissioner's decision denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.[1] The case was referred to the Magistrate Judge, with the consent of the parties, to conduct all proceedings, pursuant to 28 U.S.C. § 636(c). This order affirms the decision of the Commissioner.

**Procedural Summary**

Gomez filed an application for DIB in March 2003.[2] His claim was denied at the initial and reconsideration levels of administrative review.[3] Gomez timely requested a

---

[1] 42 U.S.C. §§ 401-434.

[2] R. 58-61.

[3] R. 43-44, 46-48, 50-53.

hearing before an administrative law judge (ALJ),[4] which was held on August 10, 2004.[5] In a decision issued February 17, 2005, the ALJ denied the claim, finding Gomez was not disabled and that he retained the residual functional capacity to perform a range of light work.[6] When the Appeals Council denied Gomez's request for review,[7] the ALJ's decision became the Commissioner's final decision under 42 U.S.C. § 405(g).[8] Gomez now brings this action for judicial review claiming that the ALJ erred by (1) failing to provide specific legitimate reasons for rejecting the opinion of a treating physician, and (2) failing to provide specific support from the record for the residual functional capacity assessment.

## Summary of the Evidence

Gomez sustained a dislocated shoulder and rotator cuff tear on October 23, 2002 when a 30 pound piece of equipment fell on him while he was at work..[9] At the time, Gomez was 50 years old, and had worked as boilermaker for 28 years.[10] On December 2, 2002, Gregory J. Hicken, M.D., performed left shoulder arthroscopic decompression and rotator cuff repair surgery.[11]

---

[4]R. 45.

[5]R. 403-46.

[6]R. 14-27.

[7]R. 6-8.

[8]*See* 20 C.F.R. § 404.981.

[9]R. 200.

[10]*Id.*

[11]R. 214.

Post-surgery treatment notes from physical therapist Kam Jarman, in January through February 2003 stated that Gomez reported he had minimal aching and was doing well with regard to his pain complaints, felt good improvement in his range of motion and strength, and had been doing activities around his home with no increase in his symptoms and he was very pleased with his progress.[12] In late February 2003, Gomez reported he was moderately sore after attempting to do some building.[13]

On March 5, 2003, Dr. Hicken noted that Gomez was making good progress with his shoulder treatment, with nearly full range of motion and almost full strength.[14] Dr. Hicken advised Gomez to continue with physical therapy for another month.[15] Dr. Hicken also noted that Gomez reported increasing problems with his longstanding left knee osteoarthritis, making him unable to walk or carry more than about ten pounds.[16] Dr. Hicken scheduled knee replacement surgery for March 17, 2003, noting that Gomez would probably be able to return to work within two months of the knee surgery.[17] At the same time, Dr. Hicken completed an Employee Status Questionnaire from Workers Compensation and indicated that although the condition was not permanent, Gomez was still not at maximum medical improvement and could

---

[12] R. 244-249.

[13] R. 244.

[14] R. 262.

[15] *Id.*

[16] *Id.*

[17] *Id.*

not yet return to his former position of employment.[18]

Dr. Hicken performed a left total knee arthroplasty on Gomez on March 17, 2003, for his history of severe degenerative left knee osteoarthritis.[19] Treatment notes dated April 2, 2003 stated that Gomez was "doing great" with excellent motion and good ability to walk.[20] On May 7, 2003, Dr. Hicken noted that Gomez had excellent stability and good muscle tone in his leg.[21] He also noted that Gomez had full range of motion of his left shoulder with improving strength. But there was some pain and crepitus in the shoulder and, at times, some numbness in the left hand.[22] Dr. Hicken advised Gomez to continue with therapy and advised he would assess his medical improvement and return to work status in another month.[23]

Physical therapy notes from March 26 through June 2, 2003, state that Gomez continued to show ongoing improvement without complications to both the shoulder and knee along with improvement in his tolerance to activity, in that he required less rest.[24] Beginning in July 2003, physical therapy notes indicate that Gomez had increasing discomfort and catching in his left shoulder and continued to struggle with all activities above his shoulder.[25]

---

[18] R. 222.

[19] R. 230.

[20] R. 261.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] R. 351-64.

[25] R. 350.

On July 2, 2003, Dr. Hicken remarked that Gomez's strength improved each time he saw him and that his knee was "doing great."[26] Dr. Hicken noted that some crepitus remained in the shoulder and restricted Gomez to no lifting more than 30 pounds, no lifting above shoulder height, and no overhead work.[27]

Treatment notes from Dr. Hicken dated September 3, 2003, stated that Gomez complained he strained his knee when a "hay bale" hit it, but he was getting better.[28] Dr. Hicken found that Gomez was walking well and had good stability and excellent range of motion. Gomez also had excellent strength and nearly full range of motion of his shoulder.[29] Dr. Hicken permanently restricted Plaintiff to no crawling and avoiding overhead welding.[30] On September 18, 2003, Dr. Hicken evaluated Gomez's shoulder due to increased crepitus and painful catching in the shoulder area.[31] He determined that an arthroscopic bursectomy was required to correct the problem.[32]

On October 13, 2003, Dr. Hicken performed an arthroscopic bursectomy to repair scar tissue in the rotator cuff that was catching.[33] By November 5, 2003, Gomez was doing well and

---

[26]R. 377.

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]R. 375-77.

had full range of motion.[34]  On December 3, 2003, Dr. Hicken found Gomez had full active and passive range of motion of his shoulder, good strength, and minimal pain.[35]  On January 7, 2004, Dr. Hicken stated Gomez would not be able to return to his job as a boilermaker, but he encouraged Plaintiff to pursue vocational rehabilitation.[36]

On April 27, 2004, Dr. Hicken noted that Gomez's shoulder was at maximum medical improvement and he had a ten percent rateable impairment of his upper extremity and a six percent whole person impairment rating.[37]  Dr. Hicken gave Gomez permanent restrictions of no overhead lifting and no lifting over 40 pounds.[38]  On May 19, 2004, Dr. Hicken completed a form for the long term disability carrier stating that Gomez had been "totally disabled" from December 2002 through the present, and that he was unable to perform the normal duties of his occupation.[39]

In a letter dated June 22, 2004, chiropractor Jeff Jex, reported that he examined Gomez on November 17, 2003, and assessed cervical, thoracic, and lumbosacral vertebral subluxations complicated by muscle spasms.[40]  He concluded that Gomez had "improved greatly," and that he

---

[34] R. 376.

[35] R. 374.

[36] Id.

[37] R. 373.

[38] Id.

[39] R. 371-72.

[40] R. 368-69.

could benefit from continued chiropractic care to prevent further degeneration.[41]

A vocational rehabilitation report dated June 23, 2004, stated that Gomez was discharged from vocational rehabilitation because it was "not feasible for vocational rehabilitation, due to his physical status, distance to the nearest town, (100 miles), [and] not able to go to training or to learn careers due to his academic aptitude."[42]

Treatment notes from Dr. Hicken dated June 28, 2004, stated that Gomez had "a little crepitus and a little weakness" in his shoulder, but otherwise, had good motion and seemed to be doing quite well.[43] Dr. Hicken encouraged Gomez to begin his rotator cuff exercises again twice a week with five pound weights.[44]

On July 26, 2004, Kam Jarman, Gomez's physical therapist completed a residual functional capacity (RFC) questionnaire stating that Gomez could walk only one block at a time; stand 15 minutes at a time and for about two hours total in an eight-hour work day; sit for two hours at a time and for about four hours total in an eight hour work day; needed to shift positions at will between; had to take unscheduled breaks to walk around about every thirty minutes; could lift and carry up to ten pounds frequently and up to 20 pounds occasionally; could perform fine and gross manipulation 75 percent of the time and reach ten percent of the time; had to lie down about two hours every day; and would miss work three to four times a month.[45]

---

[41]*Id.*

[42]R. 123.

[43]R. 370.

[44]*Id.*

[45]R. 365-67.


On November 18, 2004, Vatche Cabayan, M.D., examined Gomez in connection with his worker's compensation case. Gomez reported that he continued to experience shoulder pain with usage, limitation of motion, and a painful popping sensation.[46] Gomez stated his knee was "doing reasonably well but not good enough."[47] He stated that he avoided squatting, twisting, and lifting more than ten pounds, and he indicated that he had difficulty with prolonged walking and sitting.[48] Gomez reported he spent his time tinkering in his garage, doing long-distance driving up to two and a half hours, doing routine chores, and cooking.[49] Gomez also indicated he managed his pain with over-the-counter medication.[50]

Dr. Cabayan's examination revealed that Gomez had normal reflexes, almost full strength in his left upper extremity, and no evidence of atrophy, although there was some decreased sensation, tenderness, and crepitation.[51] Dr. Cabayan thought Gomez might have some nerve dysfunction and recommended nerve conduction studies and an MRI as well as continued conservative treatment.[52] Dr. Cabayan remarked Gomez needed to be vocationally retrained.[53] He stated Gomez was limited to no heavy lifting or heavy pushing and pulling; no overhead work

---

[46] R. 395.

[47] *Id.*

[48] *Id.*

[49] R. 396.

[50] *Id.*

[51] R. 398-99.

[52] R. 399.

[53] *Id.*

or lifting; occasional minimal weight work at shoulder level; and lifting 10-15 pounds at waist level and no more than a few pounds infrequently above shoulder level.[54]

At the hearing before the ALJ, Gomez testified that he could not work because of shoulder, knee, and back pain.[55] He stated that he could do some chores such as watering with a hose and vacuuming, but he could not move a 25 pound bag of dog food out of the back seat of the car or lift even a gallon of milk with his left arm.[56] He stated that every three or four hours he had to lie down for a short time.[57] Gomez testified that he had cramping in his hands from arthritis.[58]

Terri Marshall-Gilfillin, a vocational expert (VE), testified at the hearing that Gomez's past relevant work was classified in the Dictionary of Occupational Titles (DOT), as follows: boilermaker, DOT # 810.384-014 (heavy, skilled).[59] The ALJ asked the VE to consider an individual of Plaintiff's vocational profile (age, education, and work experience) who had could perform the requirements of light exertion work with the following limitations: occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; occasional crawling, crouching, and balancing; no overhead work, twisting, bending, stooping, or kneeling; and

---

[54] R. 400.

[55] R. 417.

[56] R. 417-19.

[57] R. 420-21.

[58] R. 425.

[59] R. 432.

avoidance of squatting, running, jumping, and repetitive stair climbing.[60]  Ms. Marshall-Gilfillin testified that such an individual would not be able to perform Gomez's past relevant work as a boilermaker.  She stated further, due to the lifting and reaching restrictions, this individual would not qualify for any skilled jobs with transferrable skills.[61]  However, the VE stated that an individual with these restrictions could work as parking lot attendant, counter clerk, and survey worker, but the number of survey worker jobs would be reduced by 75 percent due to the limitation on reaching.[62]

**Analysis**

The court reviews the ALJ's decision to determine whether the factual findings are supported by substantial evidence and whether the correct legal standards were applied.[63] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[64]  The court will "neither reweigh the evidence nor substitute [its] discretion for that of the [ALJ]."[65]

First, Gomez asserts that the ALJ failed to provide adequate reasons for rejecting the opinion of his treating physician.  The ALJ must evaluate all medical opinions in the record.  However, the weight given each opinion will vary according to the relationship between the

---

[60] R. 434-36.

[61] R. 436-37.

[62] R. 439-41.

[63] *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).

[64] *Hamlin*, 365 F.3d at 1214 (quoting *Doyal*, 331 F.3d at 760).

[65] *Id*.

claimant and the medical professional.[66]  The ALJ is required to give controlling weight to the opinion of the treating physician so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record.[67]  However, not all medical providers are "entitled to the same significant weight as reports by a physician."[68]

Gomez contends that the ALJ should have concluded that he was limited to no more than sedentary work based on the July 2004 RFC[69] provided by his physical therapist, Kam Jarman.[70] Additionally, Gomez claims that his surgeon and treating physician, Dr. Hicken, stated that Gomez could not lift more than ten pounds due to knee pain.[71]  Gomez argues that these opinions limited him sedentary work and that the ALJ rejected them without sufficient support, especially the opinion of physical therapist Kam Jarman.[72]

After a complete review of the record, it is apparent that the ALJ gave "good reasons"[73] for giving little weight to Jarman's opinion.  First of all, the ALJ correctly noted that Jarman was

---

[66]*Id.* at 1215.

[67]*Id.*

[68]*Barnett v. Apfel*, 231 F.3d 687, 690 (10th Cir. 2000); *see also* 20 C.F.R. § 404.1513(a) (excluding physical therapists from the list of acceptable medical sources).

[69]R. 365-67.

[70]Plaintiff's Brief at 6, docket no. 9, filed May 19, 2006.

[71]*Id.* (citing R.262 which is Dr. Hicken's March 5, 2003 treatment note made before the March 17, 2003 knee replacement surgery).

[72]*Id.* at 7.

[73]*Doyal*, 331 F.3d at 762.

not an acceptable medical source under Social Security regulations because Jarman lacked the medical knowledge, experience and professional stature to give his opinion substantial weight.[74] He further noted that Jarman's opinion was inconsistent with the objective medical record, including his own treatment notes.[75]  Most importantly, Jarman's opinion was contrary to that of the treating physician Dr. Hicken, who gave Gomez  permanent restrictions of no overhead lifting and no lifting more than 40 pounds.[76]  Dr. Hicken gave Gomez only a six percent whole person impairment rating, with a ten percent impairment rating for the upper extremity.[77]

Gomez's assertion that the ALJ rejected Dr. Hicken's opinion restricting him to sedentary work and lifting no more than ten pounds is unsupported in the record.  Dr. Hicken's treatment note for March 5, 2003, cited by Gomez for support, does not place any permanent restrictions on Gomez, but simply notes that Gomez reported difficulty walking or carrying more than ten pounds due to knee pain.[78]  Furthermore, this notation was made prior to successful knee surgery on March 17, 2003,[79] after which, no similar complaints or restrictions are ever mentioned.[80]

Contrary to Gomez's argument that the ALJ rejected the opinion of  his treating physician Dr. Hicken, the record shows that the ALJ gave appropriate controlling weight to Dr. Hicken's

---

[74]R. 24; 20 C.F.R. § 404.1513(a) (excluding physical therapists from the list of acceptable medical sources).

[75]See McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002) (stating ALJ may reject a medical assessment on the basis of contradictory medical evidence).

[76]R. 373.

[77]Id.

[78]R. 262.

[79]Id.

[80]R. 261, 373-78.

opinion.[81]

> The claimant's treating surgeon Dr. Hicken released the claimant to a range of light exertion in June of 2003, he gave him permanent restrictions against crawling and overhead welding in September of 2003 and gave him permanent restrictions against overhead lifting or lifting more than 40 pounds in April of 2004 - during no period of 12 consecutive months did Dr. Hicken limit the claimant to less than light exertion.[82]

In this case, the ALJ gave significant weight to Dr. Hicken's opinions and did not reject his opinion as the treating physician. Additionally, the ALJ properly discounted the opinion of physical therapist Kam Jarman because he was not an acceptable treatment source under the regulations. Accordingly, Gomez's argument that the ALJ did not provide adequate reasons for rejecting the opinion of his treating physician fails.

Next, Gomez asserts that the ALJ failed to provide specific support from the record for the residual functional capacity assessment. This argument also fails. As noted above, and based on the review of the treating surgeon's treatment notes,[83] the ALJ stated "during no period of 12 consecutive months did Dr. Hicken limit the claimant to less than light exertion."[84] The ALJ's finding that Gomez retained the capacity to perform a range of light work is also supported by the

---

[81] R. 24 ("The record as a whole, especially Dr. Hicken's opinions . . . ."); *Hamlin*, 365 F.3d at 1215; *Doyal*, 331 F.3d at 762.

[82] *Id.*

[83] R. 260-66, 370-79.

[84] *Id.*

opinions[85] of the state agency physicians that reviewed the medical evidence[86] and the RFC[87] provided with the reports was consistent with the light exertion limitations prescribed by Dr. Hicken.

Further, Gomez's own reports to medical providers indicated that he was capable of performing some work. Contrary to his self-assessment[88] and hearing testimony[89] that he had disabling pain that precluded him from working, Gomez reported to Dr. Cabayan that he spent his time working in his garage, doing long-distance driving up to two and a half hours, doing routine chores, and cooking.[90] Gomez also reported that he managed his pain with over-the-counter medication.[91]

Even shortly after shoulder surgery, Gomez reported good improvement and strength in his shoulder,[92] and increased activities a month later did not increase his symptoms.[93] Almost three months after the surgery, Gomez felt good enough to "do some building."[94] Gomez

---

[85] R. 273-76 - Utah DDS Case Summary Reports. One report noted that "if the projected date of 12 months after shoulder surgery was used instead of the knee, it would not change the decision." R. 276.

[86] R. 273-76. *See* 20 C.F.R. § 404.1527(f); SSR 96-6p (stating ALJ must treat State agency nonexamining physicians' opinions as expert opinion evidence).

[87] R. 267-72.

[88] R. 121-22.

[89] R. 417-25.

[90] R. 396.

[91] *Id.*

[92] R. 248.

[93] R. 245.

[94] R. 244.

reported similar improvement in his knee pain after the knee replacement surgery in March 2003.[95]  And again, after a second shoulder surgery in November 2003, Gomez continued to report improvement in his condition to medical providers.[96]  Consequently, the ALJ did not find Gomez entirely credible as to the severity of his symptoms because his claims were inconsistent with other evidence in the record.[97]

Therefore, based upon the treating physician's opinion, the State agency physicians' opinions, Gomez's reports on continued activities and improvement of symptoms with treatment, substantial record evidence support the ALJ's residual functional capacity assessment that Gomez could perform light work with the noted limitations.[98]

## Conclusion

In this case, the ALJ did not reject Dr. Hicken's opinion as the treating physician.  In fact, the ALJ gave Dr. Hicken's opinion the appropriate controlling weight.  Furthermore, the ALJ properly discounted the opinion of physical therapist Kam Jarman because he was not an acceptable treatment source under the regulations.  Finally, the ALJ's determination that Gomez could perform light work with prescribed limitations is well-supported by the record.

---

[95]R. 261 (good ability to walk); R. 377 (walking well, good stability and range of motion).

[96]R. 374 (almost full strength and minimal pain).

[97]R. 24, 26. *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (credibility reasonably questioned due to inconsistencies in the record).

[98]R. 24-25.

The court concludes that the ALJ applied the correct legal standards and his decision is supported by substantial evidence. Accordingly, the Commissioner's decision is AFFIRMED.

February 8, 2007.

                                        BY THE COURT:

                                        _____
                                        David Nuffer
                                        U.S. Magistrate Judge